UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PUBLIC INTEREST LEGAL FOUNDATION,

Plaintiff,

v.

JOCELYN BENSON,

Defendant.

Case No. 1:21-cv-929

HON. JANE M. BECKERING

## OPINION AND ORDER

This case presents important issues about election integrity in Michigan. On November 3, 2021, Plaintiff Public Interest Legal Foundation (PILF) initiated this case under the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 *et seq.*, against Defendant Jocelyn Benson in her official capacity as Michigan's Secretary of State, alleging violations of the NVRA's list-maintenance requirements (Count I) and disclosure requirements (Count II). Now pending before the Court are Secretary Benson's motion for summary judgment (ECF No. 148), PILF's motion for partial summary judgment (ECF No. 153), and PILF's motion for discovery (ECF No. 170). Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d). For the following reasons, the Court grants Secretary Benson's motion and denies PILF's motions. Because this Opinion and Order resolves both pending claims in this case, this Court also dismisses as moot Secretary Benson's motions in limine (ECF Nos. 120 & 135) and enters a Judgment to close this case.

## I. BACKGROUND

### A. Legal Context

**1. The NVRA, the HAVA, & the EAC**

In 1993, Congress enacted the NVRA, Pub. L. No. 103−31, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501−20511), to establish procedures that would "increase the number of eligible citizens who register to vote in elections for Federal office;" "enhance[ ] the participation of eligible citizens as voters in elections for Federal office;" "protect the integrity of the electoral process;" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1)−(4). The NVRA requires states to offer voter registration by mail, by application in person at all offices in the state providing public assistance or administering state-funded programs that primarily provide services to persons with disabilities, and by application in person while applying for a motor vehicle driver's license. *Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997). The NVRA also sets forth requirements for removing registrants from the voter registration roll because of the death of the registrant or a change in the residence of the registrant. *Id.* (citing the predecessor to 52 U.S.C. § 20507(a)(4)(A), (B)).

As other circuits have observed, the NVRA's objectives—easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls—can sometimes be in tension with one another. *See Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019); *Am. C.R. Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017). "On the one hand, maintaining clean voter rolls may help ensure election integrity, but on the other hand, purging voters from the rolls requires voters to re-register and hinders participation in elections." *Am. C.R. Union, supra.*

Section 8 of the NVRA, which is the section at issue in this case, requires states to conduct a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of," inter alia, "the death of the registrant." 52 U.S.C. § 20507(a)(4)(A). Although § 8 generally restricts states from removing ineligible registrants from the voter rolls within 90 days of an election, 52 U.S.C. § 20507(c)(2)(A), the 90-day deadline does not apply to removing registrants who have died, 52 U.S.C. § 20507. In other words, deceased registered voters may be removed from voter rolls at any time. The NVRA also requires that each state maintain and make available for public inspection certain records concerning the implementation of its voter registration activities under the Act. 52 U.S.C. § 20507(i). Last, the NVRA provides for a civil enforcement action by the Attorney General, 52 U.S.C. § 20510(a), and a civil action for "declaratory or injunctive relief" by a "person who is aggrieved by a violation" of the NVRA, *id.* § 20510(b).

In 2002, building on the reforms in the NVRA, Congress enacted the Help America Vote Act (HAVA), Pub. L. No. 107−252, 116 Stat. 1668 (codified as amended at 52 U.S.C. §§ 20901−21145). The HAVA requires states to maintain, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). Under the HAVA, "[t]he computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State," shall "contain[ ] the name and registration information of every legally registered voter in the State," and "shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. § 21083(a)(1)(A)(i), (ii), (viii). Additionally, § 21083(a)(4)(B) of HAVA provides that

"the State election system shall include provisions to ensure that voter registration records are accurate and are updated regularly, including . . . safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B). The HAVA provides that "if an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993." *Id.* § 21083(a)(2)(A)(i).

The HAVA also created the United States Election Assistance Commission (EAC), which is a bipartisan commission charged with developing guidance to meet HAVA requirements, adopting voluntary voting system guidelines, and serving as a national clearinghouse of information on election administration.[1] Federal regulations require states to provide various kinds of election data to the EAC for use in the EAC's biennial report to Congress. *See* 28 U.S.C. § 20508(a)(3); 11 C.F.R. § 9428.7. Among the data to be reported are: (1) the total number of "active" and "inactive" voters registered in the state for each of the two prior general federal elections, *see* 11 C.F.R. § 9428.7(b)(1)–(2); and (2) "[t]he total number of registrations statewide that were, for whatever reason, deleted from the registration list," *see id.* § 9428.7(b)(5). The EAC collects this data by conducting an Election Administration and Voting Survey (EAVS), asking all 50 states, the District of Columbia, and U.S. territories to provide data on various topics related to the administration of federal elections.[2]

---

[1] *See generally* eav.gov/about (last visited Feb. 21, 2024).

[2] *See generally* https://www.eac.gov/research-and-data/studies-and-reports (last visited Feb. 21, 2024).

## 2. Michigan's Election Law

As of the July 2022 census, Michigan ranked tenth in the United States in voting-age population.[3] Secretary Benson is the chief election official of Michigan and is responsible for coordination of Michigan's responsibilities under the NVRA, the HAVA, and Michigan's Election Law. 52 U.S.C. § 20509; MICH. COMP. LAWS § 168.509n. *Cf. Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (describing the NVRA as "a complex superstructure of federal regulation atop state voter-registration systems") (citation omitted). Secretary Benson is responsible for the overall operation of the Michigan Department of State (MDOS), which is organized into five separate administrations and divisions, all of which are headed by a director, who reports to the Chief of Staff (ECF No. 63 at PageID.734). The Chief of Staff then reports to the Secretary (*id.*). Relevant here is the Bureau of Elections (BOE), which is headed by the Director of Elections, Jonathan Brater. By law, Director Brater is "vested with the powers and shall perform the duties of the secretary of state under . . . her supervision, with respect to the supervision and administration of the election laws." MICH. COMP. LAWS § 168.32(1).

In compliance with the HAVA, Michigan created the qualified voter file (QVF) as the State's computerized statewide voter registration list. *See generally* MICH. COMP. LAWS §§ 168.509m(1)(a), 168.509o, 168.509p, 168.509q, 168.509r. There are currently more than 8.2 million registered voters in the state of Michigan.[4] With respect to the deaths of registered voters, state law requires the Secretary of State to—

> develop and utilize a process by which information obtained through the United States Social Security Administration's death master file that is used to cancel an operator's or chauffeur's license . . . or an official state personal identification card

---

[3] U.S. Census Bureau, Estimate of Population Age 18 Years and Older (July 1, 2022), available at https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-detail.html#v2023 (last visited Feb. 20, 2024).

[4] https://mvic.sos.state.mi.us/VoterCount/Index (last visited Feb. 20, 2024).

> . . . of a deceased resident of this state is also used at least once a month to update the qualified voter file to cancel the voter registration of any elector determined to be deceased. The secretary of state shall make the canceled voter registration information under this subsection available to the clerk of each city or township to assist with the clerk's obligations under section 510.

MICH. COMP. LAWS § 168.509o(4). For context, in 2020, 2021, and 2022, there were more than 110,000 deaths in Michigan each year.[5] The death master file compiled by the Social Security Administration (SSA) includes the names of individuals who have died outside the State of Michigan (MDOS Dep. [Def. Ex. D, ECF No. 149-5] (Joseph Szpond) at 64).

Michigan uses a multilateral process to identify and remove deceased voters from the QVF. At the department level, the MDOS has a four-step process for identifying deceased registrations, a process utilizing the statewide database for driver file records known as "CARS" (Def. Answer to Pl.'s Interrog. No. 1, ECF No. 149-3 at PageID.3085; Jt. Facts [ECF No. 157] ¶ 22). First,

> CARS receives information on a weekly basis, on average, from the Social Security Administration (SSA) and the Department of Health and Human Services (DHHS). The reports come through a secure file transfer site. If the individual record from SSA/DHHS is a 100% match to the name, date of birth and social security number contained in the customer's record in CARS, CARS automatically updates the customer record and sends a notification through QVF which automatically updates the voter's status to "Canceled–Deceased." If none of these data elements (name, date of birth, and SSN) match a CARS record, it will be considered a "no match" and CARS will disregard it. If the information from SSA or DHHS is a partial match, it is classified as a "close match" and then placed into a queue for the Driver Records Activity Unit staff, supervised by Barry Casciotti, to manually review and determine whether there is a match. If there are at least 3 data points that match, the individual will be marked as deceased in CARS. Once the customer record is updated in CARS, QVF is automatically updated.
>
> Second, on a weekly basis, the Core Technology Platform Division, supervised by Joe Szpond, produces a report from CARS containing individuals whose license or state ID are expiring within 90 days in order to process renewal notices that get mailed to customers. That file is shared with SSA to ensure that the customer's

---

[5] https://www.mdch.state.mi.us/osr/deaths/USMIcrudedxrt.asp (last visited Feb. 21, 2024). *See* FED. R. EVID. 201 (permitting a court to take judicial notice on its own of a fact that can be accurately and readily determined from a source whose accuracy cannot reasonably be questioned).

> social security number, name or date of birth have not changed. As part of an agreement, the SSA will also provide a death indicator on that report, if applicable. CARS will automatically update customer record as deceased, if they have not already been marked as deceased, and the information will transfer into the QVF in the same manner as above.
>
> Third, members of the public may send information into the Department which would lead to a cancelation. An immediate family member may send a death certificate in. Upon receipt, the Department will manually review and mark the individual as deceased in CARS, if applicable. The information will transfer into the QVF in the same manner as described above.
>
> Finally, the Bureau of Elections (BOE) receives a file via a secure file transfer of potentially deceased records from the [Electronic Registration Information Center, Inc. (ERIC)] program. BOE staff supervised by Rachel Clone, Data and Programs Unit Manager, perform a manual review to determine whether a record matches and updates the voter's registration to "Canceled–Deceased" if not already done in the update above.

Def. Answer to Pl.'s Interrog. No. 1, ECF No. 149-3 at PageID.3085–3087.

At the county level, county clerks act as the local registrar for the purpose of maintaining vital records and statistics, such as deaths. MICH. COMP. LAWS §§ 333.2804(4), 333.2815, 333.2833. "[A]t least once a month," the county clerk is required to "forward a list of the last known address and birth date of all persons over 18 years of age who have died within the county to the clerk of each city or township within the county." MICH. COMP. LAWS § 168.510(1). The city or township clerk, in turn, is mandated to "compare this list with the registration records and cancel the registration of all deceased electors." *Id.* Secretary Benson indicates that Michigan has 83 county clerks (ECF No. 166 at PageID.3356).

A local "clerk may conduct a program . . . to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township." MICH. COMP. LAWS § 168.509dd(1). Such program must be uniformly administered and must comply with the NVRA, including the requirement that any program be concluded 90 days or more before a federal election, except for removals conducted at the request of a voter,

upon the death of a voter, or upon notice that the voter has moved and applied for registration in a different jurisdiction. MICH. COMP. LAWS § 168.509dd(1), (2)(a)–(c). A local clerk may conduct a house-to-house canvass, send a general mailing to voters for address verifications, participate "in the national change of address program established by the postal service," or use "[o]ther means the clerk considers appropriate" to conduct a removal program. MICH. COMP. LAWS § 168.509dd(3). Local clerks are instructed that they are authorized to cancel a voter's registration if the "clerk receives or obtains information that the voter has died" through "QVF inbox notification" from the "county clerk," from "death notices published in [a] newspaper," or from "personal firsthand knowledge" (Michigan Election Officials' Manual, Def. Ex. H, ECF No. 149-9 at PageID.3168). Secretary Benson indicates that Michigan has 280 city clerks and 1,240 township clerks (ECF No. 166 at PageID.3356). Secretary Benson further indicates that between twenty and thirty percent of cancellations of deceased voters between 2019 and 2022 were entered by local clerks (ECF No. 149 at PageID.3041–3042).

Last, if election mail is returned as undeliverable, the registration is made inactive, and the voter is sent a notice of cancellation (Brater Dep. [Def. Ex. A, ECF No. 149-2] at 99). If the voter does not respond, and the voter does not vote for two consecutive federal elections, then the registration is cancelled (*id.*).

From 2019 to March 2023, Michigan cancelled between 400,000 and 450,000 registrations because the voters were deceased (*id.* at 77). More than 500,000 voter registrations in Michigan are slated for cancellation in 2025.[6] Federally collected data shows that Michigan is consistently among the most active states in cancelling the registrations of deceased individuals. Specifically, the EAC reported that Michigan removed the sixth largest total number of registrations based on

---

[6] https://mvic.sos.state.mi.us/VoterCount/Index (last visited Feb. 26, 2024).

death in the 2016 election cycle; the fourth most in the 2018 cycle; the fifth most in the 2020 cycle; and the fifth most in the 2022 cycle.[7]

### B. Factual Background & Procedural Posture

#### 1. Pre-Suit Correspondence

PILF, which is incorporated and based in Indianapolis, Indiana, describes itself as a "non-partisan, non-profit, public interest organization" that "seeks to promote the integrity of elections in Michigan and other jurisdictions nationwide through research, education, remedial programs, and litigation" (Compl. [ECF No. 1] ¶ 3). On September 18, 2020, about six weeks before the November 2020 presidential election, PILF wrote a letter to Secretary Benson notifying her of "inadequate list maintenance," specifically, "potentially deceased registrants with an active registration," and requesting an "immediate meeting" (Ex. 4 to Compl., ECF No. 1-4 at PageID.48–50). PILF opined in the letter that "ultimately only your office can conclusively determine whether the registrants are indeed deceased and whether voting credits were accurately issued for some registrants in subsequent elections" (*id.*). On September 29, 2020, BOE staff responded to PILF's September 18 letter, requesting that, in order for the Secretary to determine "how to best proceed," PILF "provide a written description of the matching criteria used by [PILF]

[7] U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2016 at 97 (NVRA Table 4b), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf; U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2018 at 82 (NVRA Table 3b), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2020 at 165 (Voter Registration Table 5), https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf; U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2022 at 188 (Voter Registration Table 5), https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf (last visited Feb. 20, 2024).

to substantiate" its claims "as well as electronic lists of voters PILF has identified as 'potentially deceased with an active registration'" (ECF No. 11-2, quoting PILF's 9/18/20 Letter).

On October 5, 2020, PILF responded to the BOE's letter by providing a "spreadsheet [ ] identifying the voter ID numbers of the registrants [PILF] identified" and indicating that PILF had compared registrants against the Social Security Death Index (SSDI) and matched full names, full dates of birth, Social Security Numbers, and credit address history information, which revealed "27,000 records of concern," with the remainder matching "other verifiable death record sources" (Ex. 6 to Compl., ECF No. 1-6 at PageID.52).

Beginning on the night of the November 3, 2020 presidential election, the BOE started receiving hundreds—if not thousands—of telephone calls and e-mails (MDOS Dep. (Adam Fracassi) at 183–84). Phone lines were shut down due to the volume of calls, which included calls threatening violence (*id.*). The Bureau's offices were closed to the public due to bomb threats, and staff were not allowed in the building (*id.* at 184). A significant number of lawsuits were filed immediately following the election (*id.*). The Board of State Canvassers met on November 23, 2020 to certify the results of the election, and, due to the volume of threats, the Board was required to meet in an undisclosed location (*id.*). Additionally, the Michigan Legislature sent subpoenas to the MDOS requesting tens of thousands of pages of election-related documents (*id.* at 185). Last, Bureau staff were receiving threats against them personally and were under police protection (*id.* at 186). Bureau staff were not allowed back into their offices until February 2021 (*id.* at 190). Director Brater described the fall of 2020 as a time when the Bureau's resources were "the most depleted" (Brater Dep. at 201–03).

On November 25, 2020, PILF sent a "follow-up" letter, indicating that it had not received a response to its October 5 letter and that it had purchased another copy of the QVF in October

and performed the same comparisons, which indicated that "over 27,500 voters" are on the QVF, despite SSDI indications that the voters were deceased (Ex. 8 to Compl., ECF No. 1-8 at PageID.61). PILF did not supply a spreadsheet of the voters it identified as deceased but again requested an "immediate meeting" (*id.*).

On December 11, 2020, PILF sent another "follow-up" letter, requesting Secretary Benson "permit inspection or provide copies" of certain records (Ex. 9 to Compl., ECF No. 1-9 at PageID.63–64). PILF indicated that unless copies of the records were provided, it planned to "send a representative to your office to inspect these documents on December 18, 2020" (*id.*).

On December 17, 2020, BOE staff advised PILF that it had not agreed to the inspection date and that BOE offices were closed to the public due to the COVID-19 pandemic and thus no inspection could take place (Ex. 10 to Compl., ECF No. 1-10 at PageID.65). Further, BOE staff noted that they were "still awaiting [PILF's] matching criteria . . . so [the BOE] may properly analyze [PILF's] request and determine appropriate next steps" (*id.*).

On December 18, 2020, PILF sent a letter titled as "Notice of NVRA Violation" and indicating that "a lawsuit under the NVRA may be filed within 90 days" (Ex. 11 to Compl., ECF No. 1-11 at PageID.67–68).

Last, on January 13, 2021, PILF sent another letter to Secretary Benson reminding the Secretary of its earlier letters and request for inspection and resending the October 5, 2020 spreadsheet (Ex. 12 to Compl., ECF No. 1-13 at PageID.72–73).

**2. Complaint & Discovery**

On November 3, 2021, PILF filed this suit, seeking declaratory and injunctive relief for two alleged violations of the NVRA: "Failure to Conduct List Maintenance" (Count I) and "Failure to Allow Inspection of Records and Data" (Count II). Secretary Benson subsequently

filed a Motion to Dismiss (ECF No. 10) and an Answer (ECF No. 14). In August 2022, this Court denied Secretary Benson's motion to dismiss (Op. & Order, ECF No. 35). This Court held that, taking the allegations in PILF's Complaint as true, which the Court was required to do, PILF met its burden at the pleading stage to demonstrate standing and state plausible claims against Secretary Benson. This Court conducted a Scheduling Conference on October 13, 2022 and issued a Case Management Order that same day (Minutes, ECF No. 42; CMO, ECF No. 43).

The parties conducted discovery through the end of July 2022. Secretary Benson represents, and PILF does not dispute, that over the course of the more than nine-month discovery period, PILF conducted nine depositions and issued five sets of requests for production of documents, three sets of interrogatories, and one set of requests to admit (ECF No. 159 at PageID.3287; ECF No. 174 at PageID.3540; ECF No. 176 at PageID.3580). Three of PILF's discovery requests are pertinent to the dispositive motions at bar.

*Notice to Depose Secretary Benson.* First, in February 2023, PILF served a notice of deposition for Secretary Benson, scheduling her deposition for April 20, 2023 (ECF No. 63-2). Secretary Benson moved for a protective order directing that her deposition not be taken unless PILF could demonstrate that the information sought could not be obtained from other witnesses or through other means (ECF No. 62). The Magistrate Judge held a hearing on the motion, indicating that she was "unpersuaded" that deposing Secretary Benson was necessary to PILF's case (4/13/2023 Mot. Hrg. Tr., ECF No. 75 at PageID.813). However, the Magistrate Judge granted the motion without prejudice to "reviving" the issue if "depositions or something else reveals that there is some information or some issue about which only Secretary Benson would testify or if Defendant were to insert Secretary Benson's testimony in the litigation in some way" (4/13/2023

Order, ECF No. 74; 4/13/2023 Mot. Hrg. Tr., ECF No. 75 at PageID.811, 813–814). PILF did not subsequently appeal from the Magistrate Judge's decision, nor did PILF ever renew its motion.

*Subpoenas on Non-Party ERIC.* Second, in March 2023, PILF served a subpoena on ERIC, which is not a party to this case, requesting a deposition of the organization pursuant to Federal Rule of Civil Procedure 30(b)(6) and production of documents (Ex. 19 to Wiygul Decl., ECF No. 83-2 at PageID.1830). ERIC is a non-profit, non-partisan membership organization that uses proprietary software settings to provide its member jurisdictions, including Michigan, with various maintenance reports at their request, including a "Deceased Report" that lists the names of registered voters who appear to have died (Shane Hamlin Decl. [ECF No. 82 at PageID.882–885] ¶¶ 9, 11, 27–30, & 45–53). ERIC is certified by the National Technical Information Service (NTIS), a federal agency, to obtain and use Limited Access Death Master File (LADMF) data maintained by the federal government (*id.* ¶¶ 32 & 59). After ERIC objected to the subpoena on various grounds, PILF issued a second subpoena, expanding the matters for examination with the corporate designee and expanding the descriptions of its requested document production (Ex. 19 to Robert Wiygul Decl., ECF No. 83-2 at PageID.1860 & PageID.1864).

PILF did not dispute that except for reports created within the last three years, which Secretary Benson asserted were protected from disclosure under federal law, Secretary Benson had produced to PILF all ERIC "Deceased Reports" in her possession (6/14/2023 Hrg. Tr., ECF No. 108 at PageID.1962). *See* Def. Resp. to Pl. Request to Produce No. 8, ECF No. 83-2 at PageID.1804, citing 42 U.S.C. § 1306c (Restriction on Access to the Death Master File) (prohibiting disclosure of Death Master File information for an individual during the three-calendar-year period following the individual's death, unless the person requesting the information has been certified).

ERIC moved to quash the subpoena (ECF No. 80), and the Magistrate Judge held a hearing in June 2023, indicating that PILF appeared to be "fishing" inasmuch as "the information sought by PILF regarding ERIC's origin, funding, purposes, bylaws, membership agreement, board, research advisory board, privacy and technology board, vendors, contractors, partners … appears, at least for the purposes of this litigation, to be patently overbroad" and "far outside the core of this case" (6/14/2023 Mot. Hrg. Tr., ECF No. 108 at PageID.1956–1957).

Secretary Benson, who declined to take a position on ERIC's motion to quash (*id.* at PageID.1953), opined that PILF was "overstating" ERIC's role in the list maintenance process (*id.* at PageID.1976–1977). Secretary Benson indicated that "if we've missed it on the SSDI, if we haven't gotten it through DHHS records, [and] the local clerks haven't found it, then there would be a [sic] some small subset of individuals for whom we might catch their names through the ERIC process" (*id.* at PageID.1977).[8] Secretary Benson indicated that she would not characterize ERIC's role as either "central" or "reliant" but as "cleanup" (*id.* at PageID.1976–1977).

The Magistrate Judge granted ERIC's motion to quash, finding that the requested discovery was not necessary to assessing the reasonableness of Michigan's program where PILF possessed the reports that Michigan received from ERIC, absent those that were protected from disclosure by federal law (*id.* at PageID.1978). An Order was entered that same day (6/14/2023 Order, ECF No. 102).

PILF appealed the Magistrate Judge's June 14, 2023 Order to this Court. *See* 28 U.S.C. § 636(b)(1)(A); *see also* FED. R. CIV. P. 72(a); W.D. Mich. LCivR 72.3(a) (Appeal of nondispositive matters). This Court denied the appeal, determining that the Magistrate Judge's

[8] Rachel Clone, BOE's Data and Programs Unit Manager, had previously testified at her December 2022 deposition that "[u]sually ten names or fewer" are listed on ERIC's bimonthly report (Clone Dep. at 76).

ruling was properly based on her determination that the requested discovery was neither "necessary" nor "proportional" (Memo. Op. & Order, ECF No. 165 at PageID.3333).

The original deadline for the close of discovery was May 26, 2023 (CMO, ECF No. 43); however, the Court agreed to effectuate the parties' stipulation to extend discovery to July 26, 2023 (Order, ECF No. 50). This Court's Order expressly indicated that additional requests to extend the deadlines would not be favored (*id.*).

After the close of discovery, Secretary Benson filed motions in limine, seeking to exclude (1) PILF's lists of "potentially deceased" voters, which were created by PILF's expert, Kenneth Block; (2) Block's expert opinion and reports; and (3) the expert opinion and report of former Colorado Secretary of State Scott Gessler (ECF Nos. 120 & 135). PILF opposes both motions in limine (ECF Nos. 133 & 141).

*Second Deposition of Talsma.* The third discovery request relevant to the dispositive motions at bar was made after discovery closed. On September 29, 2023, PILF filed a motion for a second deposition of Stuart Talsma, an MDOS analyst (ECF No. 143). PILF previously deposed Talsma in February 2023 and, at that time, Talsma described the methodology he could use to compare PILF's lists of "potentially deceased" voters to the QVF. *See* Talsma Dep. [ECF No. 159-1] at 86, 89. PILF did not thereafter submit a discovery request for Secretary Benson to perform the QVF query that Talsma described. However, defense counsel subsequently directed Talsma to perform the query, and, on September 12, 2023, Secretary Benson forwarded a PDF of the resulting spreadsheet to PILF's counsel. PILF argued that it "need[ed] to depose Mr. Talsma regarding this document because it is relevant to the claims and defenses in this case" (ECF No. 144 at PageID.2971). Secretary Benson opposed re-opening discovery (ECF No. 159), pointing out that the information had been available to PILF throughout the discovery period, the

availability of the information was known to PILF, and PILF never requested that information (*id.* at PageID.3290).

The Magistrate Judge noticed PILF's motion for a hearing. After hearing PILF's argument, the Magistrate Judge indicated that PILF had not explained "what additional discovery is required at this point of Mr. Talsma and why you're entitled to it" (10/10/2023 Mot. Hrg. Tr., ECF No. 163 at PageID.3304). The Magistrate Judge ultimately concluded that PILF had not demonstrated good cause for re-opening discovery to depose Talsma a second time where the QVF query was "something that could have been requested earlier in the litigation and during discovery" (*id.* at PageID.3319–3320). Additionally, the Magistrate Judge determined that the information that PILF sought did not require another deposition but could be obtained simply by requiring Secretary Benson to (a) provide PILF with the relevant spreadsheet, and (b) supplement her response to an interrogatory to include "the categories of voter status and status reasons that are included in the report and what those mean" (*id.*). The Magistrate Judge opined that the production of these two items would remedy any "asymmetry in information" that existed between the parties (*id.* at PageID.3320).

Secretary Benson agreed to provide PILF with the spreadsheet and to supplement its response, noting that PILF was also privy to two recent affidavits from Talsma wherein Talsma summarized the results of the search with respect to the status of voters on PILF's list and explained what the statuses meant (*id.* at PageID.3321). *See* 9/29/2023 Talsma Aff. [Def. Ex. I, ECF No. 149-10]; 10/2/2023 Talsma Aff. [Def. Ex. J, ECF No. 149-11]. The Magistrate Judge's ruling was effectuated by an Order entered that same day, denying PILF's motion to take Talsma's deposition a second time and ordering Secretary Benson to supplement her discovery as discussed on the record (Order, ECF No. 162). Secretary Benson indicates that she provided the

supplemental discovery on October 19, 2023 (ECF No. 174 at PageID.3547). PILF did not appeal from the Magistrate Judge's Order.

### 3. The Motions at Bar

On October 2, 2023, Secretary Benson filed her motion for summary judgment (ECF No. 148), to which PILF filed a response in opposition (ECF No. 168) and Secretary Benson filed a reply to the response (ECF No. 176). PILF also filed a motion for partial summary judgment on October 2, 2023, seeking judgment as a matter of law in its favor on Count II[9] (ECF No. 153). Secretary Benson filed a response in opposition to PILF's motion (ECF No. 166) and PILF filed a reply to the response (ECF No. 178). On October 30, 2023, PILF filed a motion for discovery (ECF No. 170), which Secretary Benson opposes (ECF No. 174).

## II. ANALYSIS

### A. Motion Standard

A party may move for summary judgment under Federal Rule of Civil Procedure 56, identifying each claim on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In resolving a motion for summary judgment, a court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted). When evaluating cross-motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the

[9] PILF also seeks summary judgment of Secretary Benson's affirmative defenses, *see* ECF No. 154 at PageID.3228–3230; however, given the Court's resolution of Counts I and II, the Court need not reach this issue.

nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506–07 (6th Cir. 2003); *see also Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir. 2003) ("[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate").

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The function of the court is not "'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249).

Rule 56(d) allows a "nonmovant [to] show[ ] by affidavit ... that, for specified reasons, it cannot present facts essential to justify its opposition," and upon such showing, "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d). "A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating ... how postponement of a ruling on the motion will enable him ... to rebut the movant's showing of the absence of a genuine issue of fact." *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (citations omitted). The affidavit must "indicate to the district court [the party's] need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the

information." *Id.* (citation omitted).

The Sixth Circuit has held that "[t]he party opposing a motion for summary judgment ... possesses no absolute right to additional time for discovery under Rule 56." *Id.* (citation omitted). Even when a party properly presents a Rule 56(d) affidavit and a motion to extend discovery, the decision to extend the discovery deadline lies within the discretion of the trial court. *Scadden v. Werner*, 677 F. App'x 996, 999–1000 (6th Cir. 2017). The Sixth Circuit has held that a district court does not abuse its discretion in denying further discovery when "the discovery requested would be irrelevant to the underlying issue to be decided" or "the information sought is overly broad or would prove unduly burdensome to produce." *Doe*, 928 F.3d at 490. Nor does a district court abuse its discretion by denying a Rule 56(d) motion that is supported by mere "general and conclusory statements" or that fails to include "any details or specificity." *First Floor Living LLC v. City of Cleveland, Ohio*, 83 F.4th 445, 453 (6th Cir. 2023) (citation omitted). Last, a district court may appropriately consider whether additional discovery would outweigh the "proportionality" concerns implicated by the delay and cost generated by continued discovery. *Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 273–74 (6th Cir. 2021).

**B. Count I: List-Maintenance Obligations**

In Count I of PILF's Complaint, PILF alleges that Secretary Benson "failed to make reasonable efforts to conduct voter list maintenance programs that ensure that the deceased do not remain registered to vote, in violation of Section 8 of NVRA, 52 U.S.C. § 20507" (Compl. ¶ 63).

In support of summary judgment in her favor on Count I, Secretary Benson argues that Michigan's multilateral process for the removal of deceased registrants from the QVF meets and exceeds the threshold of a "reasonable effort" where the process includes (a) automated removal based on exact matches to federal and state death records provided nearly weekly, (b) manual

review of "close matches" from the death records, (c) manual review of bi-monthly death reports received from ERIC, and (d) cancellations entered by local clerks based on information they receive (ECF No. 149 at PageID.3037–3042). Secretary Benson points out that PILF's argument to the contrary depends on a determination that Michigan's program—which has resulted in the 6th, 4th, 5th, and 5th most deceased-cancellations in the last four recent election cycles in a state with the nation's 10th largest number of registered voters—must nonetheless be unreasonable based on PILF's own lists matching "potentially deceased" voters derived from comparing credit reports to the SSDI (*id.* at PageID.3059). Secretary Benson argues that PILF's claim lacks merit because the NVRA itself makes no mention of any specific method of identifying deceased voters, let alone PILF's poorly-defined process[10] (*id.*).

In response, PILF first argues that it is unable to "fully present facts essential to its opposition" to Secretary Benson's motion because PILF has "not been permitted to conduct all relevant discovery" (ECF No. 168 at PageID.3434–3435). Conversely, PILF argues that its "claims are supported by record evidence, including fact and expert witness testimony" (*id.* at PageID.3438). According to PILF, Michigan's QVF contains about 27,000 potentially deceased registrants, which constitutes "undisputable evidence of a problem" (*id.* at PageID.3411).[11]

---

[10] Consistent with the argument she makes in her motions in limine (ECF Nos. 120 & 135), Secretary Benson also argues that neither the reports of Block, who helped create the lists of "potentially deceased" registrants, nor the lists themselves are admissible evidence because they are based on impermissible hearsay, i.e., the statements of unknown persons working for "Red Violet" who actually performed the searches and compiled the lists (ECF No. 149 at PageID.3060–3061). Similarly, Secretary Benson argues that even assuming Gessler's opinion is admissible evidence, it would only present the opinion of one former secretary of state as to what he believes a "reasonable" program ought to include, and his opinion would not add words to the NVRA or impose any legal obligation upon Michigan to adopt Gessler's ideas (*id.*).

[11] As evidence of the 27,000 potentially deceased registrants, PILF relies on not only its research but also its analysis of the "working papers" of Michigan's Auditor General, who performed a "death match for active voters in the QVF" in 2021, matching "First Name, Last Name (OR Former Last Name), and Date of Birth to the Death Record File from Vital Records" (ECF No. 168 at

Additionally, PILF argues that Michigan's program is not reasonable because Michigan does not compare the SSDI or MDHHS information directly against the QVF, relies on "inadequate" information from ERIC, and makes inadequate efforts to follow up on information that the MDOS receives on deceased registrants (*id.* at PageID.3437–3438).

Secretary Benson's argument has merit.

Section 8 of the NVRA prohibits states from removing registered voters from official voter lists unless such removal is "at the request of the registrant," "provided by State law," or "provided under paragraph (4)." 52 U.S.C. § 20507(a)(3)(A)–(C). Paragraph (4), in turn, requires in relevant part that "each State shall … conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the registrant[.]" 52 U.S.C. § 20507(a)(4).

Congress did not establish a specific program for states to follow for removing ineligible voters, and the Sixth Circuit has not yet addressed what "a reasonable effort" entails. The Eleventh Circuit has held that "reliance on reliable death records, such as state health department records and the Social Security Death Index, to identify and remove deceased voters constitutes a reasonable effort." *Bellitto*, 935 F.3d at 1205. According to the Eleventh Circuit, a "state is not

---

PageID.3411; ECF No. 133 at PageID.2695, citing "Auditor General Working Papers" [ECF No. 133-2]). While PILF emphasizes that the audit manager testified that the "death match yield" was between "twenty to thirty thousand" (ECF No. 133 at PageID.2695–2696, citing Jordan Schafer Dep. [ECF No. 133-3] at 139), Secretary Benson points out that "there is no dispute that the final audit report included *no finding* concerning the number of deceased registered voters" (ECF No. 176 at PageID.3578) (emphasis added). For added measure, PILF also supplies copies of several obituaries and/or photographs of gravestones for active registrants it has identified as deceased (ECF No. 168 at PageID.3411, citing Pl. Ex. A [ECF No. 168-2]).

required to exhaust all available methods for identifying deceased voters; it need only use reasonably reliable information to identify and remove such voters." *Id.*[12]

The state-specific nature of the list-maintenance task is especially evident in Michigan. As noted, Michigan ranks tenth in voting-age population in the United States, with over 8.2 million registered voters. Hence, as Secretary Benson points out (ECF No. 149 at PageID.3059), the 27,000 "potentially deceased" voters that PILF identifies would comprise approximately 0.3 percent of the total number of registered voters in Michigan. Even if all the voters on PILF's list were *actually* deceased, that number of deceased voters would simply not be unreasonable in a state the size of Michigan. As described above, federally collected data shows that Michigan is consistently among the most active states in the United States in cancelling the registrations of deceased individuals.

In a similar challenge brought by a different advocacy organization against various Pennsylvania state and county election officials, the district court indicated that such public records, including data from the EAC, "effectively torpedo" a plaintiff's theory that officials are failing to fulfill their list-maintenance obligations under the NVRA. *Jud. Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 407 (M.D. Pa. 2021) (addressing removals under the NVRA based on a change of address). *See also Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1108 (D. Colo. 2021) (indicating that an EAC report may help to provide "context" at summary judgment). The EAC data in this case is similarly fatal to PILF's claim that Michigan's program does not represent a reasonable effort to remove the names of deceased voters from the QVF.

---

[12] The Eleventh Circuit was examining the lower court's decision following a bench trial, not a decision on a motion for summary judgment. As Secretary Benson points out (ECF No. 176 at PageID.3582), the utility of the Eleventh Circuit's opinion in this barren landscape is its legal analysis of what constitutes a "reasonable effort" under the statute.

Indeed, according to MDOS analyst Talsma in September 2023, nearly 8,000 of the "potentially deceased" voters identified by PILF in its October 5, 2020 list had already been removed (Ex. I, Talsma Aff., ¶ 4). Of those cancelled registrations, 5,766 were cancelled before PILF even filed its lawsuit on November 3, 2021 (*id.* ¶ 9).

Nonetheless, PILF opines that it is not "reasonable" to merely schedule removal of registrants when the problem "should be fixed now" (ECF No. 168 at PageID.3413). The NVRA does not require states to immediately remove every voter who may have become ineligible. Under Michigan's system, the SSA death reports are compared on a weekly basis to the list contained in CARS (Harris Dep. [Def. Ex. C, ECF No. 149-4] at 25, 44). Once a person is marked as deceased in CARS, that information is updated in the QVF on a nightly basis (MDOS Dep. (Szpond) at 72). Additionally, the entire QVF is reconciled with the CARS driver file on a quarterly basis (Talsma Dep. at 97–98). Last, the bimonthly ERIC reports, which are created by comparing Michigan's QVF to the SSDI, are manually reviewed by Bureau staff within a week of receiving them (Brater Dep. at 93; Clone Dep. [Def. Ex. F, ECF No. 149-7] at 70). Director Brater explained that given the lag in time between when someone dies and when that information is received and can be used to cancel the registration, there will "always be some deceased registrants on the voter rolls" (Brater Dep. at 51). PILF's mere opinion on the topic does not serve to demonstrate that Michigan's timing for removing deceased registrants from the QVF does not meet the threshold of a "reasonable effort." Rather, the record demonstrates that deceased voters are removed from Michigan's voter rolls on a regular and ongoing basis.

PILF also identifies several areas where PILF believes that Michigan could improve its program for removing the names of deceased voters from the QVF. For example, PILF opines that "[a]mong the most significant failures are [sic] the Defendant's failure to compare Social

Security Administration (SSA) death information against the actual QVF" (ECF No. 168 at PageID.3417). PILF emphasizes that "Defendant compares the information from the SSA against its CARS database" (*id.*). However, as indicated, the bimonthly ERIC reports are created by comparing Michigan's QVF to the SSDI, and these reports are manually reviewed by Bureau staff (Brater Dep. at 93; Clone Dep. at 70).

Even assuming arguendo that PILF's suggestions have merit, the NVRA requires only a "reasonable effort," not a perfect effort, to remove registrants who have died. PILF's identification of areas for improvement does not serve to demonstrate that Michigan's multilateral process for the removal of deceased registrants from the QVF does not meet the threshold of a "reasonable effort." Like Florida's program, which the Eleventh Circuit agreed was "reasonable," *Bellitto*, 935 F.3d at 1207, Michigan similarly relies on SSDI and state health records in order to identify and remove deceased registrants, in addition to other tools to capture both in-state and out-of-state deaths, as previously described. The Eleventh Circuit properly opined that "[t]he failure to use duplicative tools or to exhaust every conceivable mechanism does not make [a state's] effort unreasonable." *Id.*

Last, PILF's request under Rule 56(d) for additional discovery does not compel a different conclusion. PILF requests three categories of discovery. First, PILF requests evidence regarding how ERIC processes deceased matches (ECF No. 172 at PageID.3528). Second, PILF asserts that it "needs to depose Secretary Benson to ascertain what policies and procedures she has put in place that resulted in the Defendant not comparing the Foundation's lists of deceased voters with the Qualified Voter File ("QVF")" (*id.* at PageID.3528–3529). Third, PILF indicates that it needs to depose Talsma about the post-discovery data run he performed (*id.* at PageID.3529–3530).

As described in the Factual Background, *supra*, all three of these evidentiary issues were the subject of previous motions, and each requested subpoena or deposition was denied. Hence, PILF is not arguing in its Rule 56(d) motion that Secretary Benson's motion for summary judgment is premature because PILF was prevented from conducting discovery or that Secretary Benson wrongfully withheld discoverable material. Rather, PILF's motion merely reiterates its prior unsuccessful arguments. Furthermore, as Secretary Benson points out in her response (ECF No. 174 at PageID.3540), PILF's Rule 56(d) motion does not articulate any specific facts that it believes it will obtain from Secretary Benson, ERIC, or Talsma that would demonstrate the existence of a question of fact. In short, PILF wholly fails to satisfy the standard for additional discovery under Rule 56(d). A plaintiff's "general desire to 'confirm that there were no further intentional or wrongful actions taking place,' to 'ensure the veracity of [the defendants'] evidence,' and to determine 'whether or not additional related information exists,' is insufficient to support its Rule 56(d) motion." *First Floor Living*, 83 F.4th at 454 (citation omitted). The Court, in its discretion, concludes that PILF's Rule 56(d) motion for discovery is properly denied.

Importantly, as noted at the outset, Congress passed the NVRA to not only protect election integrity and ensure accurate and current voter rolls but also establish procedures that increase voter participation. 52 U.S.C. § 20501(b)(1)−(4). List-maintenance programs must strike that same balance. *See* 52 U.S.C. § 21083(a)(4)(B) (requiring list-maintenance programs to include "safeguards that [] ensure that eligible voters are not removed in error from the official list of eligible voters"); *see also* 52 U.S.C. § 21083(a)(2)(B)(ii) (requiring that list maintenance be performed "in a manner that ensures that … (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list"). After conducting more than nine months of discovery into the many facets of Michigan's program for the removal of deceased registrants,

PILF has identified no genuine issue for trial regarding its claim that the program is not reasonable. Therefore, the Court concludes that Secretary Benson is entitled to judgment as a matter of law on Count I.

**B. Count II: Disclosure Obligations**

In Count II, Plaintiff alleges that Secretary Benson failed to allow PILF to "inspect records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of Michigan's official lists of eligible voters in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i)" (Compl. ¶ 69). At the conclusion to its Complaint, in its request for relief, PILF requests that this Court "[o]rder[ ] the Defendant to allow inspection of records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of Michigan's official lists of eligible voters" (ECF No. 1 at PageID.19).

In her motion for judgment as a matter of law as to Count II, Secretary Benson first argues that PILF has failed to demonstrate any actual injury it incurred through not receiving the information it requested, and so has failed to demonstrate standing to bring its claim in Count II, even if there were a statutory violation (ECF No. 149 at PageID.3062–3064; ECF No. 166 at PageID.3349–3351). Secretary Benson argues that she is also entitled to judgment as a matter of law as to Count II on its merits. According to Secretary Benson, PILF's requests went beyond "records of programs" and sought documents not obtainable under the NVRA without a court order (ECF No. 149 at PageID.3064–3067; ECF No. 166 at PageID.3354–3357). Last, Secretary Benson points out that she has already provided PILF—through discovery—all responsive records of Michigan's list maintenance activities; therefore, an injunction is no longer required for PILF to obtain the requested documents, and PILF's claim is now moot (ECF No. 149 at PageID.3067–3069; ECF No. 166 at PageID.3358).

In response, PILF argues that its standing "has only been strengthened through discovery" (ECF No. 178 at PageID.3622). According to PILF, it has standing to bring its claim in Count II because it has suffered not only an informational injury but also "downstream consequences," such as being prevented from "engaging in regular, identifiable, programmatic activities that have a nexus to the interests Congress sought to protect via the NVRA" (ECF No. 168 at PageID.3439–3443; ECF No. 178 at PageID.3623–3624). Additionally, in its cross-motion for summary judgment, PILF argues that it is entitled to judgment as a matter of law on Count II because it is undisputed that before the filing of this litigation, PILF requested from Secretary Benson four categories of voter list maintenance records that fall "squarely" within the broad scope of the NVRA's public disclosure provision and that Secretary Benson did not provide PILF with any of the requested records before the filing of this lawsuit (ECF No. 154 at PageID.3218–3225). According to PILF, Secretary Benson's denial of timely access to list maintenance records emphasizes PILF's need for a permanent injunction as PILF has no assurance that she will provide documents in the future (ECF No. 168 at PageID.3443–3445; ECF No. 154 at PageID.3225–3228). PILF asserts that even if all responsive documents have now been provided, Secretary Benson has "not shown that [her] impermissible conduct will not recur" (ECF No. 178 at PageID.3630).

Secretary Benson's argument has merit.

The NVRA provides that states will "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Here, in December 2020, PILF requested the following categories of records:

> 1) Data files your office has received from the federal Social Security Administration listing deceased individuals.

2) Any records relating to the cancellation of deceased registrants from the Qualified Voter File ("QVF"), including but not limited to reports that have or can be generated from Michigan's QVF.

3) Any records relating to the investigation of potentially deceased registrants who are listed on the QVF, including but not limited to correspondence between your office and local election officials.

4) All records and correspondence regarding your use of the Electronic Registration Information Center to conduct voter roll list maintenance.

(Ex. 9 to Compl., ECF No. 1-9 at PageID.63–64). The Sixth Circuit has not addressed the precise scope of the NVRA's disclosure provision. In a case PILF filed in North Carolina, the Fourth Circuit held that while the term "all records" in the provision is broad, the NVRA's disclosure provision "does not encompass any relevant record from any source whatsoever, but must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies." *Public Interest Legal Foundation, Inc. v N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021).

Secretary Benson represents, and PILF does not dispute, that PILF is in possession of all responsive records of Michigan's list maintenance activities. Therefore, the Court's threshold inquiry is whether Count II is moot. "Mootness can be raised at any stage of litigation because it is a jurisdictional requirement." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008). If PILF's claim is no longer redressable because it has obtained all available records through discovery, then this Court need not decide whether such records fell within the NVRA's disclosure provision, or whether their disclosure was blocked by some other law or legal principle. "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

It is a fundamental principle under Article III that courts may adjudicate only live cases or controversies. *Ohio v. Yellen*, 53 F.4th 983, 989 (6th Cir. 2022) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013)). A plaintiff must plausibly show at the outset of the suit its standing to sue, to wit: that it has suffered an actual or imminent and concrete and particularized injury in fact traceable to the defendant and likely to be redressed by a favorable decision. *Id.* at 989–90 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "And the plaintiff must continue to have a live interest in such a remedy throughout the proceeding." *Id.* (citation omitted). If that interest is lost after the complaint is filed, then the plaintiff's case may become moot. *Id.* (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)). "When that intervening circumstance is the defendant's voluntary abandonment of a contested behavior, however, the case remains live unless the defendant establishes that there is no 'reasonable possibility' it will resume such behavior." *Id.* (citing *Resurrection Sch. v. Hertel*, 35 F.4th 524, 529 (6th Cir. 2022) (en banc)).

The context in which PILF made its December 2020 request for documents was unique. Specifically, PILF's demand was made at an historically busy time for the Michigan BOE and at a time when BOE offices were closed to the public due to the COVID pandemic. Additionally, PILF's request is unique to this case, as were Secretary Benson's objections. Last, Secretary Benson had at least a good-faith belief that PILF was not entitled to all the records it requested. Indeed, this Court confirmed as much with regard to the requested ERIC records. *See* Memorandum Opinion and Order (ECF No. 165). PILF opines that there is nonetheless a reasonable possibility that Secretary Benson will fail to timely produce unspecified records in response to a future request. PILF made the same argument in a case it pursued in Pennsylvania. That trial court denied PILF its request for permanent injunctive relief, finding that "PILF's fears of baseless future denials and withholding are purely speculative." *Pub. Int. Legal Found. v.*

*Chapman*, 595 F. Supp. 3d 296, 306 (M.D. Pa. 2022), decision clarified on reconsideration sub nom. *Pub. Int. Legal Found. v. Schmidt*, No. 1:19-CV-622, 2023 WL 2778692 (M.D. Pa. Feb. 28, 2023). The same finding is appropriate on this record. The possibility for a continuing live interest in its record request must be reasonable, not merely theoretical.

Even if this Court were persuaded that PILF's claim is not moot and that a permanent injunction is warranted, the scope of any injunction this Court could fashion to remedy PILF's claim in Count II is unclear. Awarding permanent injunctive relief requires a movant to prove first, that it will suffer irreparable injury absent the requested injunction; second, that legal remedies are inadequate to compensate that injury; third, that balancing of the respective hardships between the parties warrants a remedy in equity; and fourth, that the public interest is not disserved by an injunction's issuance. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (citations omitted). Every order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1).

PILF has not demonstrated any irreparable injury that would support a permanent injunction. In its motion for summary judgment, PILF makes only a general request for "judgment as a matter of law" (ECF No. 153 at PageID.3204), without explicitly setting forth the terms of its proposed permanent injunction. Secretary Benson opines that PILF merely states a generalized demand that she "comply with the NVRA" (ECF No. 166 at PageID.3661). PILF does not identify authority in support of such a broad restraint. Additionally, should Secretary Benson fail to satisfy her disclosure obligations in the future, the NVRA provides an adequate remedy at law. *See* 52 U.S.C. § 20510(b). For the reasons stated, neither equity nor public interest would be served by the issuance of a permanent injunction on these facts.

In sum, PILF no longer has a live interest in its claim in Count II to inspect the requested records, and PILF identifies no meaningful relief that this Court could appropriately grant. Accordingly, Secretary Benson is also entitled to judgment as a matter of law on Count II.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Secretary Benson's Motion for Summary Judgment (ECF No. 148) is GRANTED.

**IT IS FURTHER ORDERED** that PILF's motion for discovery (ECF No. 170) is DENIED.

**IT IS FURTHER ORDERED** that PILF's Motion for Partial Summary Judgment (ECF No. 153) is DENIED.

**IT IS FURTHER ORDERED** that Secretary Benson's motions in limine (ECF Nos. 120 & 135) are DISMISSED as moot.

Because this Opinion and Order resolves both claims, the Court will also enter a Judgment to close this case. *See* FED. R. CIV. P. 58.

Dated: March 1, 2024

/s/ Jane M. Beckering
JANE M. BECKERING
United States District Judge