UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAMON JACKSON,

     Plaintiff,

v.                                    Case No. 24-cv-11072

MICHIGAN SECRETARY OF                 Honorable Robert J. White
STATE, et al.,

     Defendants.

---

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO
DISMISS THE AMENDED COMPLAINT AND DENYING PLAINTIFF'S
MOTIONS FOR RECUSAL**

---

I.    <u>Introduction</u>

     Ramon Jackson commenced this 42 U.S.C. § 1983 action against Michigan's Secretary of State Jocelyn Benson, the City of Detroit Department of Elections, Detroit City Clerk Janice Winfrey, and two unnamed defendants. The amended complaint alleges that the individual defendants conspired during previous elections to register voters who no longer reside in the City of Detroit and cast fake ballots using some of their identities. The district judge previously assigned to this case granted Jackson's application to proceed without prepaying the filing fee. (ECF No. 7, PageID.115).

Before the Court are defendants' separate motions to dismiss the amended complaint. (ECF Nos. 11, 13). Jackson responded. (ECF Nos. 18, 21). None of the defendants filed a reply. Jackson also filed two motions for recusal, to which none of the defendants responded. (ECF Nos. 19-20). The Court will decide the motions without oral argument pursuant to E.D. Mich. LR 7.1(f)(2). For the following reasons, (1) the motions to dismiss the amended complaint are granted, and (2) the motions for recusal are denied.

## II.   Background

Jackson's central narrative is that Michigan Secretary of State Jocelyn Benson, Detroit City Clerk Janice Winfrey and two unnamed defendants conspired during the 2017, 2020, 2021, 2022, and 2024 elections to register voters who no longer reside in Detroit and cast fake ballots using some of their identities. (ECF No. 6, PageID.61, ¶ 3). He asserts that the scheme diluted the votes he cast in these same elections. (*Id.*; PageID.75, ¶ 2).

The amended complaint alleges violations of (1) the Fourteenth Amendment's Equal Protection Clause, (2) the Fifteenth Amendment, (3) the National Voter Registration Act of 1993, (4) the Voting Rights Act of 1965, and (6) 18 U.S.C. § 241. Jackson requests, among other things, a declaratory judgment that the prior elections violated the United States Constitution. And he seeks the issuance of an injunction, prior to the impending 2024 general election, directing

the individual defendants to remove from the "registered voter list" (1) all previous residents who relocated from Detroit between 2010 and 2022, (2) any voters who relocated from Detroit or the state of Michigan and "were registered through fraud," and (3) "all deceased people . . . who passed away between 2010 and 2022." (*Id.*, PageID.75, ¶ 3).   Defendants now move to dismiss the amended complaint in its entirety. (ECF Nos. 11, 13).

III.   <u>Legal Standards</u>

Fed. R. Civ. P. 12(b)(1) provides for the dismissal of an action where the district court lacks subject matter jurisdiction.  Rule 12(b)(1) motions for lack of subject matter jurisdiction may challenge either (1) the facial sufficiency of the pleading itself, or (2) the factual grounds for invoking subject matter jurisdiction. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  Facial challenges address whether the complaint alleges a basis for subject matter jurisdiction.  The Court views the complaint's allegations as true and construes them in the light most favorable to the nonmoving party. *Id.*

Whether a party has standing raises an issue of the court's subject matter jurisdiction under Rule 12(b)(1). *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). The plaintiff, as the party invoking federal jurisdiction, carries the burden of establishing the elements of standing. *Ward v. Nat'l Patient Account Servs. Sols.*, 9 F.4th 357, 363 (6th Cir. 2021).

3

When reviewing a motion to dismiss the complaint for failing to state a claim, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true." *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) (cleaned up); *see also* Fed. R. Civ. P. 12(b)(6). "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead sufficient factual matter to render the legal claim plausible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quotation omitted).

IV.   <u>Analysis</u>

   A.   *Fourteenth Amendment Equal Protection*

Jackson initially claims that the voter fraud conspiracy violated the Fourteenth Amendment's Equal Protection Clause because the fake ballots diluted his own votes in several previous elections, thereby infringing his fundamental "right to fair elections." (ECF No. 6, PageID.61, ¶ 3).

The Fourteenth Amendment to the United States Constitution prohibits states from "denyin[g] to any person within [their] jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 5 to the Fourteenth Amendment empowers Congress to "enforce this article through appropriate legislation." *Id.* at § 5. Congress enacted 42 U.S.C. § 1983 pursuant to its power under section 5 to enforce the Amendment's substantive provisions. *See*

*Ngiraingas v. Sanchez*, 495 U.S. 182, 187 (1990).  The statute precludes state and local officials from depriving "citizen[s] of the United States . . . of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

Yet, "[n]o matter what Congress provides by statute, the plaintiff must still satisfy" the federal constitution's Article III "standing prerequisites." *Buchholz v. Tanick*, 946 F.3d 855, 867 (6th Cir. 2020).   Article III of the United States Constitution limits federal court jurisdiction to actual cases or controversies. U.S. Const. art. III, § 2.   The doctrine of standing emanates from this "case-or-controversy" requirement and "limits the category of litigants empowered to maintain a lawsuit in federal court to [those who] seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).   Declaratory judgment actions are not exempt from Article III's "case-or-controversy" requirement. *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844 (6th Cir. 1994); *see also Spencer v. City of Hendersonville*, No. 20-6168, 2021 U.S. App. LEXIS 30313, at *7 (6th Cir. Oct. 8, 2021).

Since this case is at the pleading stage, Jackson must "clearly . . . allege facts demonstrating" (1) an imminent, concrete, and particularized injury-in-fact, that (2) is traceable to defendants' conduct, and (3) can be redressed through a favorable judicial decision. *Spokeo*, 578 U.S. at 338 (quotation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Insofar as Jackson seeks a judgment declaring that the elections conducted previously in 2017, 2020, 2021, 2022, and 2024 are invalid because of the alleged voter fraud conspiracy, he lacks Article III standing to obtain that relief. (ECF No. 6, PageID.75, ¶ 2).  Two reasons support this conclusion.

To begin with, Jackson cannot show that he suffered an injury-in-fact that is concrete and particularized, *i.e.*, the first Article III standing prong.  His claim that the conspiracy resulted in the dilution of his own votes in prior elections is "an injury to his right to vote like all citizens who participate in the electoral process." *Mirarchi v. Boockvar*, No. 21-126, 2021 U.S. Dist. LEXIS 247842, at *7 (E.D. Pa. Dec. 30, 2021).  That type of injury is "so widespread that it amounts to a general grievance rather than a particularized harm." *Id.* at *7; *see also Bost v. Ill. State Bd. of Elections*, No. 23-2644, 2024 U.S. App. LEXIS 21142, at *8 (7th Cir. Aug. 21, 2024) (holding that "to the extent Plaintiffs would suffer any injury" from their vote dilution claim "it would be in a generalized manner and not 'personal and individual' to Plaintiffs"); *Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020) ("Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing.") (cleaned up); *Martel v. Condos*, 487 F. Supp. 3d 247, 252-53 (D. Vt. 2020) (same); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020) (same); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as

such, [is] more akin to a generalized grievance about the government than an injury in fact.").

Jackson cannot plausibly establish redressability either, *i.e.*, the third Article III standing prong. Assuming he could somehow demonstrate that his past diluted votes resulted in a concrete and particularize harm, a decision in Jackson's favor could never redress that injury. That's because those past elections already occurred – they are "certified and final." *Mirarchi*, 2021 U.S. Dist. LEXIS 247842, at *8-9; *see also King v. Whitmer*, 505 F. Supp. 3d 720, 730 (E.D. Mich. 2020) (finding a 2020 election recount lawsuit moot under Article III because the Michigan Board of State Canvassers had already certified the election and the governor had submitted the slate of electors to the archivist of the United States); *cf. Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 559 (6th Cir. 2021) (discussing how Article III redressability and mootness are "related" but "distinct doctrines").

As for prospective injunctive relief, Jackson lacks Article III standing for largely the same reason: the unlawful dilution of his vote is a generalized grievance, not the concrete and particularized harm necessary to establish an injury-in-fact. *See, e.g., Bost*, 2024 U.S. App. LEXIS 21142, at *8; *Wood*, 981 F.3d at 1314-15. What is more, even if Jackson could somehow demonstrate that he suffered a concrete, particularized harm stemming from past vote dilution, he does

not plausibly allege, much less show, that another conspiracy to register fake voters and cast votes on their behalf is "certainly impending" – in other words, imminent. *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981-82 (6th Cir. 2020); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient" to establish Article III standing) (cleaned up).  Without plausible allegations of an imminent, concrete, and particularized injury, Jackson has "no standing to sue and thus no basis for moving forward with" his equal protection claim. *Shelby Advocates*, 947 F.3d at 982.

Nonetheless, placing aside Article III standing, Jackson's equal protection claim lacks merit.  The right to vote "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation omitted).  A state electoral scheme or practice that unduly burdens or restricts the right to vote is inconsistent with the Equal Protection Clause. *See Bullock v. Carter*, 405 U.S. 134, 140-41 (1972).

The Supreme Court employs a "flexible standard" to evaluate whether an electoral practice is unconstitutional. *Burdick*, 504 U.S. at 434.  Denominated the *Anderson-Burdick* framework, it's a balancing test that requires federal courts to "weigh the character and magnitude of the asserted injury" to the right to vote

8

against the state's asserted interest justifying "the burden imposed by its rule" or practice. *Id.*; *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626 (6th Cir. 2016). Courts must then "determine the legitimacy and strength of each of those interests and consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 693 (6th Cir. 2015) (cleaned up).

Applying this rubric, Jackson does not plausibly allege that defendants imposed any burden on his individual right to vote. All the Equal Protection Clause guarantees is that "qualified voters have the right to vote and to have their vote counted equally with other individual qualified voters in the same electoral unit." *Election Integrity Project Cal., Inc. v. Weber*, 2024 U.S. App. LEXIS 20618, at *28 (9th Cir. Aug. 15, 2024). That means vote dilution is impermissible when a state election practice diminishes the voting strength of a particular sub-set of qualified voters *relative* to other qualified voters – not when the practice diminishes the voting strength of the *entire pool* of qualified voters, as Jackson suggests. "After all, dilution of voting power, in an absolute sense, occurs any time the total number of votes increases in an election." *Id.* at *28. So "any ballot – whether valid or invalid – will always dilute the electoral power of all other votes in the electoral unit equally." *Id.* at *29. This form of "across-the-board" vote dilution does not implicate equal protection.

Also, Jackson omits any allegations concerning whether the conspiracy targeted voters belonging to a protected class, such as one "defined by race, alienage, or national origin." *Maye v. Klee*, 915 F.3d 1076, 1086 (6th Cir. 2019). Nor does he venture as far as to advocate that current and former Detroit residents deserve protected class status. *See, e.g., Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (holding that "[c]ounty of residence is not a suspect classification warranting heightened scrutiny" unless a "distinction along county lines is a proxy for some other form of discrimination"); *Cobbs v. Robinson*, 528 F.2d 1331, 1336 (2d Cir. 1975) (deciding that "[r]esidents of the City of Bridgeport are also not necessarily a cognizable class" without a "showing . . . that the city lines also serve to separate racial groups or economic classes to any significant extent."); *City of Berkeley v. Ferguson-Florissant Sch. Dist.*, No. 19-168, 2019 U.S. Dist. LEXIS 190785, at *9 (E.D. Mo. Nov. 4, 2019) (noting that the parties highlighted "no evidence or case law which supports a claim that residents of a municipality are a protected class."); *cf. Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 549 (6th Cir. 2007) (observing that non-residency in a municipality is not a classification "along suspect lines"); *Vere v. City of Adrian*, No. 15-10745, 2016 U.S. Dist. LEXIS 94390, at *6 (E.D. Mich. Jul. 20, 2016) (same).  And Jackson points to no "cognizable class of voters [that] has disproportionately benefitted from or suffered injury as a result of" the conspiracy. *Weber*, 2024 U.S. App. LEXIS 20618, at *30.

Since the amended complaint fails to plausibly show how the conspiracy diluted the votes of a specific category of qualified voters *relative* to other qualified voters, the equal protection claim could not withstand Rule 12(b)(6) dismissal even if Jackson did possess Article III standing.

B.    *Fifteenth Amendment*

The Fifteenth Amendment prohibits federal and state officials from denying or abridging a citizen's right to vote "on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.   A Fifteenth Amendment "vote dilution challenge" requires a showing that "the state or political subdivision acted with a discriminatory purpose." *Reno v. Bossier Parish Sch. Bd.* (*Bossier Parish I*) , 520 U.S. 471, 481 (1997); *see also Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion) ("Our decisions . . . have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose"); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002).

Because Jackson does not allege that he belongs to a specific racial class, or that racial discrimination motivated the purported conspiracy, he fails to state a plausible claim for relief under the Fifteenth Amendment. *See Willing v. Lake Orion Community Sch. Bd. of Trustees*, 924 F. Supp. 815, 819 (E.D. Mich. 1996) (dismissing the complaint because the plaintiff "made no allegations of any

discriminatory purpose as required to state a claim for relief under the Fifteenth Amendment.").[1]

C.     National Voter Registration Act of 1993

Congress enacted the National Voter Registration Act ("NVRA") to, among other things, "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4).  The statute authorizes a private right of action for (1) someone "who is aggrieved by a violation of [the] Act," and (2) "provide[s] written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1).

The secretary of state is Michigan's "chief election official." Mich. Comp. Laws § 168.509n (stating that "[t]he secretary of state is responsible for the coordination of the requirements imposed under . . . the national voter registration act of 1993"); *see also Pub. Interest Legal Found. v. Benson*, No. 21-929, 2022 U.S. Dist. LEXIS 246223, at *4 (W.D. Mich. Aug. 25, 2022) ("Secretary Benson is the chief election official of Michigan and is responsible for coordination of

---

[1] Another problem is that the United States Supreme Court has never expressly recognized a Fifteenth Amendment vote dilution claim. *See, e.g., Reno v. Bossier Parish Sch. Bd. (Bossier Parish II)*, 528 U.S. 320, 334 n.3 (2000) ("We have never held that vote dilution violates the Fifteenth Amendment."); *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993) ("We never have held any legislative apportionment inconsistent with the Fifteenth Amendment.").

Michigan's responsibilities under the NVRA").  The notice requirement's purpose is to "provide states in violation of the Act an opportunity to attempt compliance before facing litigation." *Association of Community Orgs. for Reform Now (ACORN) v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997).

The pre-suit, written notice requirement is necessary to confer statutory standing upon a private party. *See, e.g., Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1042-45 (9th Cir. 2015) (analyzing whether the plaintiffs provided proper notice to obtain statutory standing under the NVRA); *Scott v. Schedler*, 771 F.3d 831, 835 (5th Cir. 2014) ("Although notice is framed here as permissive rather than mandatory, other NVRA provisions indicate that notice is mandatory."); *Pub. Interest Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1010-11 (D. Alaska 2023) (same); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 715 (S.D. Miss. 2014); *Am. Civ. Rights Union v. Martinez-Rivera,* 166 F. Supp. 3d 779, 794-95 (W.D. Tex. 2015); *Cromwell v. Kobach*, 199 F. Supp. 3d 1292, 1310-12 (D. Kansas 2016); *Ga. State Conf. of the NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012); *cf. ACORN*, 129 F.3d at 838 (dispensing with statutory pre-suit notice where Michigan's governor issued an order "for the clear purpose of officially refusing to comply with the" statute).

Here, the amended complaint contains no allegations that Jackson ever provided Secretary Benson with any form of written notice about the purported

statutory violations before filing this lawsuit.  So he lacks the requisite statutory standing to pursue the NVRA claim.

Jackson disagrees with this outcome.  He asserts – for the first time in his response brief – that he properly notified Secretary Benson after meeting with a State Department investigator to discuss "all the allegation[s] lodged in the complaint." (ECF No. 18, PageID.292).  Jackson also claims to have forwarded a "packet" to "one of the Chief Investigators, but to no avail." (*Id.*).  None of these last-minute revelations alter the Court's decision.

To start with, the Court will not consider Jackson's account because the amended complaint omitted these allegations.  He cannot supplement the pleadings now through a response brief. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020) (holding that the plaintiffs could not "amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint."); *see also Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) (observing that courts "must focus only on the allegations in the pleadings" when deciding a motion to dismiss).  Nor does the investigator meeting alone constitute adequate statutory notice because NVRA pre-suit notifications must be "written." 52 U.S.C. § 20510(b)(1).

And Jackson's contention that he deposited a "packet" with one of the department's "chief investigators" is too vague to establish whether the packet's

14

*contents* plausibly meet the pre-suit notice requirement.   Federal courts have typically found notice sufficient when it "(1) sets forth the reasons that a defendant purportedly failed to comply with the NVRA, and (2) clearly communicates that a person is asserting a violation of the NVRA and intends to commence litigation if the violation is not timely addressed." *Pub. Int. Legal Found. v. Boockvar*, 370 F. Supp. 3d 449, 457 (M.D. Pa. 2019) (collecting cases); *see also Benson*, 2022 U.S. Dist. LEXIS 246223, at \*22.   The Court has no way of discerning whether the materials Jackson submitted to the investigator satisfy these criteria. *See Fritz*, 592 F.3d at 722; Fed. R. Civ. P. 8(a).

Since Jackson fails to plausibly demonstrate that he adhered to the NVRA's pre-suit notice standard, his entitlement to relief under the statute is unwarranted. *See, e.g., Boockvar*, 370 F. Supp. 3d at 457 (dismissing the complaint as "devoid of any allegations that the Foundation sent Secretary Torres, or that he received, written notice of the violation."); *Cromwell v. Kobach*, 199 F. Supp. 3d 1292, 1311 (D. Kan. 2016) (dismissing the complaint where the plaintiffs "wholly fail[ed] to allege that they sent any notice to the State prior to filing suit.").[2]

---

[2] Without referencing any authority, the Detroit Department of Elections and Clerk Winfrey contend that the NVRA does not authorize civil lawsuits against local election agencies or officials.   According to them, the statute "only allows for a civil action against a state's chief election official, which is the Michigan Secretary of State." (ECF No. 11, PageID.143).   This statement is flatly untrue.

D.      *The Voting Rights Act of 1965*

Next, Jackson broadly asserts that defendants violated his right to participate

in "fair elections." (ECF No. 6, PageID.74-75, ¶¶ 56-57).  He locates this distinct

right in the Voting Rights Act of 1965 ("VRA").

Section 2(a) to the VRA forbids state and local governments from imposing

a "voting qualification or prerequisite to voting or standard, practice, or procedure"

that "results in a denial or abridgement of the right of any citizen of the United

States to vote on account of" race, color, or inclusion in a "language minority

group." 52 U.S.C. §§ 10301(a); 10303(f)(2).  Section 2(a) calls for a results-driven

---

The Court identified numerous instances where NVRA claims proceeded against local election agencies and officials.  In some of those cases, federal courts rejected the identical argument the Detroit defendants raise here. *See*, *e.g., Majority Forward v. Ben Hill Cty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1370, 1375 (M.D. Ga. 2021) (granting preliminary injunctive relief against a county board of elections after concluding that the board violated the NVRA); *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 615-16 (E.D.N.C. 2017) (denying a county board of elections' motion to dismiss the complaint and rejecting its argument that "because the mandates of the NVRA are directed to states, it, as a local government unit, is not a proper party."); *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1360-62 (S.D. Fla. 2016) (rejecting a local election official's argument that the Florida Secretary of State and the State of Florida "are the only entities that a private party can sue under the NVRA."); *Martinez-Rivera*, 166 F. Supp. 3d at 791-93 (same); *cf. Harkless v. Brunner*, 545 F.3d 445, 457-58 (6th Cir. 2008) (holding the statewide director of a social services agency responsible for implementing the statute even though "local authorities have the independent responsibility to comply with the NVRA" as well); *Miller v. Blackwell*, 388 F.3d 546, 546-47 (6th Cir. 2004) (permitting NVRA claims against a local election agency to proceed without staying the enforcement of the district court's temporary restraining order).

analysis.   The statute examines whether the implementation of a "voting qualification or prerequisite to voting or standard, practice, or procedure" yields a discriminatory outcome.  A "showing of intentional discrimination" is useful, but unnecessary. *Husted*, 834 F.3d at 636; *see also Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002).

Section 2(b), on the other hand, is explanatory.  It provides that a section 2(a) violation occurs when:

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

Section 2(b) contemplates two discrete theories of liability. *Husted*, 834 F.3d at 636.  The first is a "vote-dilution" claim, alleging that "a districting practice denies minorities an equal opportunity to elect representatives of their choice." *Id.* (cleaned up).  The second is a "vote-denial" or "vote-abridgment" claim, alleging "the denial of opportunity to participate in the political process." *Id.* (cleaned up).

Jackson patterns his VRA claim on the "vote-dilution" model. (ECF No. 6, PageID.61, 65-66, 68, 75, ¶¶ 3, 19, 24-25, 29, 31, 57).  But this theory falters on two grounds.   *First*, Jackson neglects to identify any "methods of electing

representatives – like redistricting or at-large districts" that dilute the voting strength of a particular minority group, *i.e.*, the essential allegation in a section 2(b) "vote-dilution" claim. *Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 U.S. App. LEXIS 24472 (6th Cir. Oct. 1, 2014).  And *second*, even assuming the alleged conspiracy could in some way qualify as a "districting practice," the amended complaint fails to explain how the practice dilutes the voting strength of African-American voters, or any other racial or "language minority group," in particular.

Without pleading these core elements, Jackson fails to plausibly establish an actionable section 2(b) VRA claim.

E.      *18 U.S.C. § 241 Conspiracy*

Jackson resorts to 18 U.S.C. § 241 as the statutory linchpin for his conspiracy allegations.  Section 241 is a criminal conspiracy statute that does not contemplate "private right[s] of action." *United States v. Oguaju*, 76 F. App'x 579, 581 (6th Cir. 2003); *see also Booth v. Henson*, 290 F. App'x 919, 921 (6th Cir. 2008).  Because Jackson lacks standing to bring a section 241 conspiracy claim as a private citizen he cannot proceed with this cause of action. *See Booth*, 290 F. App'x at 921.

F.      *Recusal*

Lastly, Jackson moves to disqualify the undersigned from adjudicating this case. (ECF Nos. 19-20).  Federal judges must recuse themselves from a proceeding if their impartiality might reasonably be questioned or they harbor a personal bias or prejudice towards a party. 28 U.S.C. § 455(a), (b)(1); *see also* Code of Conduct for United States Judges, Canon 2A.  Recusal is not evaluated from the moving party's subjective vantage point. *Burley v. Gagacki*, 834 F.3d 606, 615-16 (6th Cir. 2016).  The standard is an objective one.  It compels recusal only when "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Id.* at 616 (quotation omitted).  The moving party bears the burden of demonstrating whether disqualification is appropriate. *Id.*

Jackson argues that the undersigned is conflicted from hearing this case because the lawsuit challenges Michigan's 2020 presidential election results, President Biden was declared the winner of that election, and the undersigned is indebted to President Biden for his appointment to the bench. (ECF No. 19, PageID.299-300, ¶ 2).

Past litigants have raised the same argument to no avail.  And Jackson's rendition encounters the same obstacle: "[t]here is no support whatsoever for the contention that a judge can be disqualified based simply on the identity of the President who appointed him." *Straw v. United States*, 4 F.4th 1358, 1363 (Fed.

Cir. 2021); *see also Landingham v. DOJ*, No. 22-3968, 2024 U.S. App. LEXIS 525, at *4 (6th Cir. Jan. 8, 2024) (holding that judicial appointment by a specific president is "not enough to require" disqualification); *Davis v. United States DOJ*, No. 23-3244, 2024 U.S. App. LEXIS 22159, at *9 (10th Cir. Aug. 30, 2024) (agreeing with numerous other circuits that "a judge's appointment by a particular president is not alone a basis for disqualification."); *In re Exec. Off. of the President*, 215 F.3d 25, 25-26 (D.C. Cir. 2000) (holding that neither the recusal statute nor the Code of Conduct requires a judge's recusal even from a case involving the president who appointed him); *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998) (deciding that a judicial appointment "by a particular administration . . . is not a ground for questioning a judge's impartiality.").

Jackson's belief that a "contrived effort" exists to "assign this case to recent Biden appointees" is likewise unfounded. (ECF No. 19, PageID.300, ¶ 4). Civil cases filed in the Eastern District of Michigan are assigned to district judges through random selection. E.D. Mich. LR 83.11(a). Civil cases are reassigned to newly-appointed district judges "in accordance with administrative order[s] authorized by the Court." E.D. Mich. LR 83.11(b)(4). Chief United States District Judge Sean F. Cox directed the Clerk of the Court to generate the undersigned's civil caseload through "random method." E.D. Mich. Admin. Order No. 20-AO-

020 (effective Aug. 1, 2024).  So the assignment of this case occurred entirely through happenstance.

In a last-ditch effort, Jackson asks the undersigned to, in effect, forward the disqualification motion to Chief Judge Cox so he can "immediate[ly] reassign this case to a different judge to avoid the appearance of impropriety." (ECF No. 19, PageID.300).  Because Chief Judge Cox lacks the authority to reassign the case to another district judge unilaterally, however, the undersigned cannot abide by that request. *See* E.D. Mich. 83.11(b)(2).

Since there are no other discernible grounds that would justify disqualification, the corresponding motion is denied.  Accordingly,

IT IS ORDERED that defendants' motions to dismiss the amended complaint (ECF No. 11, 13) are granted.

IT IS FURTHER ORDERED that the amended complaint (ECF No. 6) is dismissed <u>with prejudice</u>.

IT IS FURTHER ORDERED that Jackson's motions for recusal (ECF Nos. 19-20) are denied.

Dated: October 18, 2024          s/Robert J. White
                                 Robert J. White
                                 United States District Judge